1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10
11

DOMINGO LAUREL,

Petitioner,

12

v.

13

WILLIAM MUNIZ, Warden,

14

Respondent.

15
16

Case No.  14-05118 BLF (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY; DIRECTIONS TO
CLERK**

17        Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254

18    challenging his state conviction.  Respondent filed an answer on the merits.  Petitioner did not file

19    a traverse although given an opportunity to do so.  For the reasons set forth below, the Petition for

20    a Writ of Habeas Corpus is **DENIED**.

21
22

## I.  BACKGROUND

23        Petitioner was sentenced on December 14, 2010, to twenty-five years to life in state prison

24    after a jury in Santa Clara County Superior Court convicted him of forcible rape, kidnapping,

25    assault with a deadly weapon, and criminal threats.  (Ans. Ex. 1, Clerk's Transcript ("CT") at 84-

26    86, 470-475, 500-505.[1])

27
28    [1] All references herein to exhibits are to the exhibits submitted by Respondent in support of the
answer.  (*See* Docket Nos. 20-23.)

United States District Court
Northern District of California

On May 25, 2012, the California Court of Appeal remanded the case for the limited purpose of resentencing, but otherwise affirmed the conviction.[2] (Ex. 5 at 2, 23.) Petitioner sought review in the California Supreme Court, which denied review on August 22, 2012. (Ex. 7.)

The California Court of Appeal denied a petition for writ of habeas corpus on January 22, 2013. (Ex. 9.) The California Supreme Court denied petitions for writ of habeas corpus on April 17, 2013, and October 15, 2014. (Exs. 10 & 11.)

Petitioner filed the instant habeas petition on November 19, 2015.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal on direct appeal:

*Evidence Adduced at Trial*

M., [FN4] the victim in this case, refused to testify at trial. The court found her unavailable as a witness and allowed the following preliminary hearing testimony to be read into the record.

FN4. We refer to the victim only as M. to protect her anonymity.

*Preliminary Hearing Testimony – M.*

M. lived with appellant for 16 years; they had two children together both of whom are teenagers. After their relationship ended, appellant lived in Madera, but would stay with the family on weekends. However, he and M. were no longer romantically involved.

On July 2, 2009, M. planned to go on a casual date with Abraham. Around 9:30 p.m., M. went to meet with him at a McDonalds restaurant next to the Honda dealership where Abraham worked. While she was waiting outside the restaurant talking to Abraham on her cellular telephone, appellant appeared in her car. Appellant was very upset; M. thought that appellant heard her talking on her cellular telephone to Abraham. While sitting in the front passenger seat, appellant told M. that he was very angry that she was dating someone else and that he wanted her back. According to M., they began to argue. Appellant grabbed her by her hair and told her that they should go home; M. was scared. M. explained that because appellant wanted to talk and there were people at her house, she

---

[2] The California Court of Appeal found that Petitioner's sentence for assault with a deadly weapon should have been stayed pursuant to California Penal Code § 654. (Ex. 5 at 2, 23.)

United States District Court
Northern District of California

drove to another location somewhere off the freeway. M. said that appellant had something in his hand; at first she refused to identify it as a knife. Appellant said that he wanted a second chance but she said no. Then, appellant asked her to have intercourse with him; at first she said no, but then said "okay." Appellant did not have what M. described as a piece of iron in his hand anymore.

M. had intercourse with appellant in the back seat of the car. She said that at first she did not want to have intercourse with appellant, but later it was "Okay, fine." After they had intercourse, M. cleaned herself with some towels she had in the car. M. said she got out of the car for a little while and then appellant told her, "Let's go home." She got back into the car and they went home. Later that night M. left and went to dinner with Abraham. She said that she stayed at the girlfriend's house that night.

M. recalled that about two days later she spoke to a police officer, but said she only understood part of what he was saying because they spoke in English. She said that she had gone to Abraham's work and appellant was there, but they did not speak. Abraham called the police. When the police arrived she told Officer Moggia that she had not had consensual intercourse with appellant for a year; that appellant had grabbed her by her hair and held a knife to her right cheek area. [FN5] M. confirmed that she told Officer Moggia that appellant said she was a bitch for dating someone else. She explained that appellant was very angry. M. conceded that she told the officer that appellant jumped into the front seat of her car and held a knife to her face. Further, M. agreed that she told the officer that appellant scratched her twice with the knife on the shoulder, but tried to excuse appellant's behavior by explaining that she had made him very angry and he lost control.

FN5. M. still denied that it was a knife at the preliminary hearing.

When asked if there was anything around the area where they stopped, M. said there was nothing. When asked if appellant said, "Okay, bitch, I hear you have another person" M. replied, "Yes, of course." M. confirmed that she told the officer that she did not want to be with appellant; that appellant said, "Since you don't want to be with me, I'll give you something you will never forget"; and that appellant pulled her into the back seat and pulled off her pants. When asked if that was what really happened, M. began to equivocate, saying, "Not really. He didn't pull me. He grabbed me and placed me there on the seat." When asked if appellant pulled off her pants, M. replied, "Before that, no. But he told me that… I had been his wife for so many years, asking why didn't I want to be with him, that if I really had something going with this guy. Said to him: No. Never. And then he said: Okay, I want to have sexual relations with you. And then on the one hand, I didn't want to, but then later: Okay, I give in."

When asked if she told the officer that she was pushing, kicking and yelling, no I don't want to, M. said, "Okay. At first, it's true, I said it: I didn't want to. But after we argued when I was trying, like, to get him off me, like pushing him, I said: Okay, fine. I haven't had anyone else in my life. And he's my children's father. So I… kept going. We kept going. And, okay. So we

3

finished and that's it. But, yes, I won't deny that I was pushing him." M. confirmed that when she told appellant that she did not want to have sexual intercourse, he said, "I don't care." When asked if she just had intercourse with appellant so he would let her go, M. replied, "On the one hand, I won't deny it. On the other hand, I also wanted it. I repeat, otherwise, I would not have let him do it."

When asked if she told Officer Moggia that appellant pushed her out of the car and drove off, M. explained that she got out of the car to get some fresh air and relax and appellant told her to get back in so they could leave. However, she did not want to, so appellant told her he was going to leave. She said appellant only acted as if he was leaving, but then came back. M. admitted that appellant lifted her and put her in the front seat and that she was "a little emotional." M. said that she did not call the police because she was scared the children would blame her. She did not deny that is what she told the officer.

M. testified that she told the sexual assault nurse that appellant cut her with what she thought was a knife. When asked if she told the nurse that appellant said "I want to kill you because you're a bitch" M. said that appellant said that when he was angry. When asked if she told the nurse that appellant said "If you call [the] police, I will kill your mother and father," M. said, "Well, not exactly. He got scared when he saw blood on me. Maybe he said that... maybe he thought that I was going to call the police." M. added that she knew that appellant was not really going to do it.

M. admitted that she sent a letter to appellant's defense attorney saying that she wanted all the charges against appellant dismissed because his children really needed him; that she said appellant "never did anything like this before and [she did] not want to cause him any harm"; and that in the letter she never said that appellant did not force her to have intercourse but rather she did not want him to get into trouble.

While M. was testifying, the prosecutor produced a letter that M. had given to him that morning. The prosecutor pointed out that in the letter M. said that she had talked to the police because she thought that she would teach appellant a lesson; and that M. had written that she "never meant for this to happen. My husband is a good man and he is innocent." M. did not disagree. Thereafter, the prosecutor said, "But he did surprise you in the back of your car, grab your hair?" "With some sort of knife?" "And drove you to a remote location, you kicked and punched him and said, no, you didn't want to have sex with him. But he pulled your pants off and had sex with you anyway.... And all that makes you think he's innocent?" M. asked the prosecutor if he wanted her to answer that. When he confirmed that he did, M. said "Of course, yes." When the prosecutor asked her if she was trying to protect her children, she replied, "Not exactly. Because my children – we are human beings. We are human beings. We all make mistakes. But God gives all of us a second chance. And I've known him for 16 years. He had never done it before. And he doesn't deserve for that being here all this time."

4

*Kathleen Stallworth – Sexual Assault Response Team (SART) Nurse*

The SART nurse testified that she examined M. on July 4, 2009. She observed two superficial lacerations on M.'s right shoulder area and another superficial linear laceration on her right upper arm. However, she did not see any injuries to M.'s vaginal area, but her training and experience had taught her that in sexual assault cases there is a "large area of injury and non-injury in the genital area" depending on a number of factors; often a person can have non-consensual sex and have no injuries.

*Jenny Adler – Rape Crisis and Domestic Violence Counselor*

Jenny Adler testified as an expert on coping behaviors of women who have been battered, raped and sexually assaulted. Her expertise included knowledge of rape trauma syndrome and intimate partner battering. Ms. Adler testified that she did not know M. or appellant and had not read any police reports about the case. Her generic testimony was as follows.

As far as sexual assault is concerned she explained that there is a stigma associated with it in that society prefers to blame the victim and to assume that the victim "asked for it in some way."

Rape trauma syndrome explains the behavior of the typical victim of rape. There are three stages to the syndrome: the "crisis impact stage" when the assault happens initially in which the victim acts the same way she did before the assault happened. The victim does not break down, but instead goes back through shock and denial as a "coping skill" or "survival technique"; it is easier to live life not being a rape victim.

Thereafter, from minutes to days after the assault, the shock and denial go away. In some cases, denial and shock can last a decade. At some point, however, the impact will hit and the victim will experience anxiety and depression; the coping skills are no longer sufficient. From there the victim enters the second stage – "the reorganization stage." The victim must reorganize her life and coping skills to figure out and survive what has happened. Some victims describe it as "being stuck on an emotional roller coaster." One minute the victim feels fine and the next the victim is in tears. The second stage lasts from months to years before the victim reaches some sort of a stable life.

When the victim becomes more stable he or she attains the "resolution stage." However, not all victims reach this stage; "trigger[s]" that remind the victim of the assault can send them back to the "reorganization stage." Some victims reach the same functioning level as they had before the assault, while others are the "walking wounded" reaching only a very low functioning stability.

Denial is a coping mechanism where the mind tricks the victim into thinking there was no assault because it is easier to go through life not being a rape survivor. Where the perpetrator is not a stranger and the victim knows the rapist, denial can lead to minimization of the sexual assault and even recantation

5

of prior rape allegations.  This happens quite frequently in both domestic violence and sexual assault cases.  When the victim knows the perpetrator, the people in the victim's life also know the perpetrator and pressure the victim to recant.

During the sexual assault the victim has coping behaviors; shock makes them compliant and unable to make decisions.  Victims will bargain, stall or make excuses for safety reasons; they will try to make the perpetrator happy and/or flatter the perpetrator to reduce the risk.  When the victim knows the perpetrator, the victim tends not to fight back because of the "trust factor."  People have a level of trust in people simply because they know them.  A combination of shock, denial, fear and inability to make decisions will make a victim not even think to scream or fight.

Only one-third of rapes are reported; victims do not always report sexual assault because of shame, embarrassment, humiliation and denial.  It is very common for a victim to apologize or blame herself for the rape.  Fear for children can cause a victim to keep quiet.  Finally, if the perpetrator commits other crimes in addition to the rape, the victim will prefer to focus on the crime that does not make the victim feel damaged, dirty and ashamed.

As to intimate partner battering, "battered women's syndrome" [FN6] describes a common set of reactions to physical, financial, or emotional abuse from a partner.  Emotional abuse includes threats, manipulation, intimidation, and isolation.  Victims of abusers often feel powerless, worthless, hopeless, violated and fearful.

FN6.  The "more accurate and now preferred term" for battered women's syndrome is intimate partner battering and its effects.  (*In re Walker* (2007) 147 Cal.App.4th 533, 536, fn. 1.)

An abuser keeps the victim helpless by threatening harm to the children; the abuser uses the children to deliver negative messages to the victim, or will gossip to the children about the victim and say negative things, name call, make accusations, or disclose personal information.  This is called the "messenger effect."  The abuser turns the children against the victim thereby further abusing the victim.

"Learned helplessness" occurs when the victim internalizes the abuse in order to stay as safe as possible in the relationship.  The victim accepts the abuse and stays with the abuser because the victim feels worthless and believes they are to blame.  Adler summarized the experimental evidence on learned helplessness in which laboratory dogs that had been locked in cages and subjected to random electric shocks did not try to leave their cages even when the cages were open.

"Traumatic bonding" is the term used to describe the psychological impact of being under the power and control of someone else for an extended period of time.  It is another survival skill that the victim uses to stay as safe as possible in the relationship, even if safety is emotional rather than physical.  Traumatic bonding is common in kidnapping and hostage situations.  A type of post

traumatic stress disorder occurs in a victim that has experienced trauma such as sexual assault or domestic violence manifesting itself in the victim being jumpy, on high alert with a really startle response. A person with this "exaggerated fear" might hear a small noise and have an exaggerated response to it. Such a person may see the abuser as more powerful than they really are.

There are three stages in the cycle of abuse. The first stage is the honeymoon stage, where the relationship is healthy and both parties present themselves in a positive light. The second stage is the tension stage, where stress builds up. Even healthy relationships experience the tension stage. However, in an abusive relationship there is a third stage – the explosive stage – where the abuser explodes and take power and control from the victim; even if the abuse is emotional rather than physical the victim feels violated. After the explosive stage, the abuser apologizes to the victim and takes responsibility for his or her actions; the relationship returns to the honeymoon stage. Eventually, the tension and explosive stages recur. In time, the explosive stage occurs more frequently and more violently; the honeymoon stage disappears because the abuser blames the victim for provoking the abusive behavior. Adler explained that in her experience, "people have been severely beaten and bruised and battered and bleeding and had to go to the emergency room" and that one study showed that 33 percent of female murder victims were murdered by their intimate partners.

Sharing children with an abuser is the number one reason why abused victims do not leave the abuser; finances, fear and even love are other reasons. Statistics show that it takes seven tries for a victim to leave an abuser.

Similar to victims of sexual assault, denial, minimization and recantation are common coping skills for victims of intimate partner battering. A victim will have a different mindset immediately after the explosive stage – angry, violated, hurt – than he or she will have a few weeks later when the honeymoon stage returns – denial, self-blame, no anger. Victims of intimate partner battering commonly recant reports of abuse to the police after they receive pressure from family, blame themselves, minimize the abuse, or deny it occurred.

*Other Evidence Introduced*

The jury listened to appellant's recorded police interview. During the interview, appellant admitted that he hid in the back of M.'s car when she left home because he wanted to see if she was meeting a man. Appellant said he listened while M. talked to her date on her cellular telephone. He scared her when he revealed himself. Appellant said he became angry, and very upset and nervous. He took M.'s telephone and would not give it back because he was afraid she would call the police. He made M. drive away from the parking lot at the McDonalds because he wanted to be alone with her and did not want the police to arrive. Appellant said he used a knife to scare M. and scratched her with it; he had the knife in his hand all the time. When they stopped and parked in a dark and remote location, appellant told M. that he wanted to have intercourse with her one last time and then they would never see each other again. It had been almost a year since they had intercourse and he "lost [his] senses due to

everything that happened." Appellant said he felt angry and knew that probably he should not have had intercourse with M., [FN7] but he did not force her and she did not say no. However, she was afraid.

> FN7. When asked if he knew that he did not have the right to "make love to her," appellant replied, "Ah, well truthfully it is right that I didn't because...."

Trial counsel stipulated that appellant sent M. four text messages: the first message, which was sent on July 1, 2009 at 6:04 a.m., stated "['] ... how pretty. I'm never going to forget how good you smell, even when I'm dead.'" The second message sent at 6:29 a.m. the same day stated "'I already know you don't love me. Lie to me or whatever, but at least answer.'" The third message sent on July 3, 2009, stated "'Hello, my love. I'm waiting for you at McDonald's, whore.'" Finally, at 11:35 a.m. the same day, appellant sent M. a text message that stated "'July 2nd, 2009, will be a day you'll never forget....'"

The jury listened to M.'s recorded police interview. In the interview, M. told Officer Moggia that appellant jumped from the back seat of her car into the front, scaring her. Appellant grabbed her by her hair and held a knife to her throat. Appellant told her she was a bitch for having another boyfriend. Appellant told M. to drive while he held the knife to her throat; and he cut M. while she was driving.

M. said she was confused and ended up driving toward Morgan Hill and to a dark area off Bailey Road. Appellant told M. he wanted to have intercourse with her; when she said no, appellant said, "'Ah, I don't care if you want [it] or not.'" M. explained that she told appellant that her new friend was "'macho'" and appellant told her not to say that or "'I'll kill you.'" M. told appellant that she did not want to be with him anymore; appellant told her "'I'll give you something, and you never forget.'" Appellant grabbed M. and put her into the back seat of the car. M. told appellant "'No, don't do that, don't do that.'" When M. said she did not want to have intercourse, appellant said, "'I don't care.'" Appellant took off M.'s pants as she was fighting with him. Appellant had intercourse with M. Appellant put M. out of the car and started to drive away. However, he came back, picked up M. and put her into the car. M. told Officer Moggia that she did not call the police because of her children.

*People v. Laurel*, No. H036416, slip op. at 2-12 (Cal. Ct. App. May 25, 2012) (hereinafter "Op.").

# III. DISCUSSION

## A.    **Standard of Review**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

United States District Court
Northern District of California

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review. (*See* Exs. 10 & 11.) The California Court of Appeal, in its opinion on direct review, addressed one of the ineffective assistance of counsel claims Petitioner raises in the instant petition, i.e., Claim 1. (*See* Ex. 5.) The Court of Appeal thus was the highest court to have reviewed the claim in a reasoned decision, and, as to that claim, it is the Court of Appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). The other claims were raised in state habeas petitions which were summarily denied.

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B.**   **Claims and Analysis**

Petitioner asserts the following grounds for relief: (1) ineffective assistance of trial counsel for failing to object to expert witness Adler's testimony regarding irrelevant issues which had the potential to increase the jury's sympathy for the victim and increase the jury's prejudice towards Petitioner; (2) ineffective assistance of counsel for failing to cross-examine Adler and to secure an independent expert witness; (3) ineffective assistance of appellate counsel for failing to raise Claim No. 2 on appeal; (4) violation of his due process right to be present at his sentencing on January 9, 2014; (5) ineffective assistance of trial counsel for failing to challenge his one-strike enhancement for kidnapping and personal use of a deadly weapon; (6) ineffective assistance of appellate counsel for failing to raise Claim No. 5; (7) ineffective assistance of trial counsel for failing to challenge his sentence as cruel and unusual punishment in violation of the Eighth

1  Amendment because it was substantially harsher than similarly situated defendants; (8) ineffective

2  assistance of appellate counsel for failing to raise Claim No. 7; and (9) ineffective assistance of

3  appellate counsel for failing to argue that there was insufficient evidence to support a guilty

4  finding on the kidnapping count.  (Pet. at 6; *id.* Attach. at 6-2 to 6-10.)

5         1.     **Ineffective Assistance of Trial Counsel (Claims 1, 2, 5, & 7)**

6            a.     **Failure to Object to Expert Testimony (Claim 1)**

7        Petitioner's first claim is that trial counsel was ineffective for failing to object to

8  "irrelevant and prejudicial expert testimony" by expert witness Adler which had the potential to

9  increase the jury's sympathy for the victim and increase the jury's prejudice towards Petitioner.

10  (Pet. at 6; *id.* Attach. at 6-2.)

11        The Court of Appeal considered this claim on direct review:

12        Appellant asserts that much of Adler's testimony was irrelevant and highly

13  prejudicial.  Appellant argues that with respect to the rape charge, the only significant disputed issue was whether the sexual encounter was consensual.

14  Since M. did not testify at trial and gave conflicting accounts of what happened, appellant concedes that some of Adler's testimony regarding recantation was

15  relevant to show that M.'s initial statements to Officer Moggia were more likely to be accurate than her subsequent testimony at the preliminary hearing.

16  However, appellant draws the line there.  He avers that the testimony that rape victims frequently comply with their assailant's demands during the assault, that

17  victims who are assaulted by known acquaintances tend not to fight back, and that victims blame themselves for what happened, was completely irrelevant to any

18  disputed issue.  At no time did the defense suggest that M.'s failure to call for help demonstrated that the encounter was consensual, M. did fight back and the

19  question of whether M. blamed herself for what happened was not before the jury.

20  Moreover, the testimony concerning the high incidence of rape victims reporting other crimes such as assault, but downplaying the rape, was irrelevant because M.

21  did not do that.

22

23        With respect to Adler's testimony on intimate partner battering (IPB) appellant argues that it was almost entirely irrelevant because there was no

24  evidence whatsoever that appellant had ever been physically or emotionally abusive to M..  Appellant concedes that expert testimony on IPB is admissible

25  even in the absence of a history of abuse between the defendant and the complaining witness; however, he asserts that it must still be relevant.  Appellant

26  acknowledges that in *People v. Brown* (2004) 33 Cal.4th 892, the California Supreme Court held that an expert's explanation of why domestic violence

27  victims frequently recant and give conflicting statements was admissible despite a lack of evidence of prior abuse.  (*Id.* at pp. 902, 908.)  Nevertheless, he argues

28

United States District Court
Northern District of California

that this rule cannot be extrapolated to a rule that an IPB expert may testify to anything whatsoever including that IPB consists of both physical and emotional abuse, threats, intimidation and isolation of the victim, the messenger effect, that past behavior is predictive of future behavior, the phenomena of learned helplessness and traumatic bonding and the cycle of abuse. Appellant asserts that there was no evidence that he had ever engaged in any of these activities and telling the jury about them had no purpose other than to make them assume that if an expert was discussing them, he must have committed them. Further, M. had left the relationship almost a year before the events underlying the case and the "horrific" testimony regarding the dogs exposed to electric shocks served no legitimate purpose other than to rouse the juror's sympathy toward M. and their anger toward appellant. Moreover, the testimony on the cycle of abuse served no purpose since there was no evidence before the jury that any stage of this cycle had ever occurred in M.'s relationship with him. These gratuitous references to shocking and entirely irrelevant information served only to inflame the jurors' passions and prejudice them against him.

As a result, appellant claims that because the vast bulk of Adler's testimony was subject to exclusion on the ground that it was irrelevant and its prejudicial effect exceeded its probative value or was outside the scope of permissible testimony on rape trauma syndrome and IPB, there is a strong likelihood that virtually all her testimony would have been excluded or subject to being struck if trial counsel had objected on those grounds or even cross examined Adler. Thus, appellant argues, this failure on counsel's part constituted ineffective assistance.

(Op. at 12-13.)

The Court of Appeal then rejected this claim:

It is well settled that to establish a claim of ineffective assistance of counsel, defendant must first demonstrate that trial counsel's representation fell below the standard of reasonableness under prevailing professional norms. In addition, appellant must show that trial counsel's deficient representation subjected him to prejudice, i.e., that there is a reasonable probability that, but for counsel's failings, the results would have been more favorable to him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.)

"A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury* (2003) 30 Cal.4th 342, 389.) In sum,

United States District Court
Northern District of California

appellant "must show that counsel's action or inaction was not a reasonable tactical choice" (*People v. Jones* (2003) 30 Cal.4th 1084, 1105); and must do so based on the record before us, not an easy task.

In *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), the California Supreme Court held that evidence of rape trauma syndrome – "an 'umbrella terminology' which includes a very broad spectrum of physical, psychological, and emotional reactions" to rape (*id.* at p. 241, fn. 4) – is inadmissible to prove that rape did, in fact, occur. (*Id.* at p. 251.) Where, however, "the alleged rapist has suggested to the jury that some conduct of the victim after the incident – for example, a delay in reporting the sexual assault – is inconsistent with her claim of having been raped" (*id.* at p. 247), some "expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths. [Citations.]" (*Id.* at pp. 247-248, fn. omitted.)

In *Bledsoe*, the court held that the evidence of rape trauma syndrome was not admitted for a proper purpose because "the victim promptly reported the attack," immediately exhibited the type of emotional reaction that lay jurors associate with rape, and suffered physical injuries that corroborated her claim. (*Bledsoe, supra,* Cal.3d at p. 248.)

Whether or not appellant explicitly suggested it, the evidence may well have suggested to the jury that M.'s behavior after the incident was inconsistent with her being raped. For instance, why did M. wait two days to report the rape? Only when Abraham called the police did she tell Officer Moggia what happened. Why did she partially recant at the preliminary hearing, and make excuses for appellant's behavior? Why did she diminish appellant's culpability and take the blame for some of appellant's actions? As can be seen *ante*, M. testified that appellant cut her with his knife because *she* made him lose control; that initially she did not want to have intercourse but *she* changed her mind; that *she* did not call the police because *she* did not want her children to blame *her*. All these things needed explanation. Thus, the rape trauma evidence helped to disabuse the jury of any misconceptions they may have had about the behavior of rape victims, leaving them free to evaluate M.'s testimony and behavior in light of that knowledge.

As to the evidence regarding IPB, we find that much of it was cumulative on the issue of why M. failed to report the traumatic episode to the police immediately after it happened, her insistence that she consented to have sex with appellant and her attempt to get the charges dropped. [FN8]

FN8. "The discretion granted to courts by section 352 is not absolute or unlimited but requires the trial judge to balance the probative value of the proffered evidence against its prejudicial effect in the context of the case before the court. (*Brainard v. Cotner* (1976) 59 Cal.App.3d 790; *Kessler v. Gray* (1978) 77 Cal.App.3d 284, 291.) The more substantial the probative value the greater must be the prejudice in order to justify

13

exclusion. Among factors which should be considered are its materiality; the strength of its relationship to the issue upon which it is offered; whether it goes to a main issue or merely to a collateral one; and, *whether it is necessary to prove proponent's case or merely cumulative to other available and sufficient proof.*" (*Burke v. Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 774, italics added.) Here, the rape trauma syndrome evidence was more than sufficient to explain why M. failed to report the traumatic episode to the police, her insistence that she consented to have sex with appellant and her attempt to get the charges dropped. Further, since there was no evidence that there was a history of domestic violence in this case, the intimate partner battering evidence carried less evidentiary weight and probative value than the rape trauma evidence. Had defense counsel objected, it is likely the court would have excluded the evidence as cumulative on the issue of why M. partially recanted.

Nevertheless, "'[t]he failure... to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence... "'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel....'"' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140.)

More importantly, even if this court assumed for the sake of argument that there was no rational tactical reason for counsel's failure to object to some of Adler's testimony, to succeed on a claim of ineffective assistance of counsel, appellant must show that he was prejudiced by counsel's deficient performance. If it is easier to dispose of an ineffective assistance of counsel claim on the ground of lack of sufficient prejudice, that course should be followed. (*Strickland, supra,* 466 U.S. at p. 697.)

We see no reasonable probability that the outcome of the case would have been different. (*People v. Ledesma, supra,* 43 Cal.3d at pp. 217-218.) We reiterate that a reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland, supra,* a p. 694.)

The evidence as presented does not undermine our confidence in the outcome. First, Adler told the jury that she knew nothing about the case; and the jury was instructed that it was not required to accept Adler's testimony as true or correct, and that it could disregard any opinion that it found unbelievable, unreasonable, or unsupported by the evidence. We must presume that the jury meticulously followed this instruction. (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73.) Second, as appellant concedes in his opening brief, M.'s "behavior after the assault was highly consistent with having been raped: within two days of the encounter with [him], she gave a police officer a highly detailed description of being assaulted, kidnapped, and raped." While Adler's testimony explained why thereafter M. partially recanted, it did not take away from that first report to Officer Moggia that appellant had grabbed her by the hair, held a knife to her cheek, made her drive to a remote location, and then picked her up and put her

United States District Court
Northern District of California

into the back of her car and had intercourse with her as she was pushing, kicking and yelling "no." There was simply no logical or rational reason for the jury to believe, as defense counsel argued to the jury, that M. gave the officer such a highly detailed description of what happened just because the interview was conducted at her boyfriend's place of employment and to an officer that was not Spanish speaking. [FN9]  Moreover, in his interview with the police, appellant admitted that he had scared M. and that he used his knife to scratch her; that he was angry; and that he had intercourse with M..  His statement that he "lost [his] senses due to everything that happened" and should not have had intercourse with her strongly suggests that their sexual encounter was not consensual.

> FN9. In essence, defense counsel argued that M.'s account of what happened given to Officer Moggia was not reliable because it was conducted "at her boyfriend's place of employment" by "and officer that was not Spanish speaking" and M. "struggle[d] with English."

By their very nature, because sex offenses are both serious and are committed in secret, trials involving sex offenses are primarily credibility contests between the victim and the defendant. (See *People v. Fitch* (1997) 55 Cal.App.4th 172, 182.)  Nothing in the record suggests that M.'s account of the events that she gave to Officer Moggia was inherently improbable; and appellant's statements to the police detailing his actions during the incident strongly undermine his position at trial that he reasonably believed that M. consented to go with him and to have intercourse with him.  [FN10]  Accordingly, given the state of the evidence we cannot say there is a reasonable probability that the result of the proceeding would have been different had defense counsel interposed specific and timely objections to some of Adler's testimony.

> FN10. Basically, defense counsel argued that appellant actually and reasonably believed that M. went with him willingly and actually and reasonably believed that M. consented to have intercourse with him.

Finding no prejudice, we reject appellant's claim that he was denied the effective assistance of counsel. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 [a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes that (1) counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted.  If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails].)

(Op. at 13-18.)

As discussed by the state appellate court, Petitioner must establish two things in order to prevail on a Sixth Amendment ineffectiveness of counsel claim. *See supra* at 12.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of

United States District Court
Northern District of California

reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *Id.* at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice), *cert. denied*, 516 U.S. 1124 (1996).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 1410-11. The general rule of *Strickland*, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

The state appellate court's rejection of this claim was not unreasonable in light of its finding that Petitioner was not able to show prejudice, *Strickland*'s second prong. 466 U.S. at 694, 697. Adler's expert testimony was comprised of evidence regarding rape trauma syndrome and intimate partner battering. *See supra* at 5-7. The state appellate court found that the evidence of rape trauma syndrome was relevant and more than sufficient to explain M.'s inconsistent behavior following the incident, i.e., "why M. failed to report the traumatic episode to the police, her insistence that she consented to have sex with appellant and her attempt to get the charges

1  dropped." *See supra* at 13-14; (Op. at 15, fn. 8). Accordingly, it found that had counsel objected

2  to Adler's testimony, the trial court was likely to have excluded the evidence of intimate partner

3  battering, which not only carried less evidentiary weight because there was no history of domestic

4  violence in this case but was cumulative on the issue of why M. partially recanted. *Id.* Even so,

5  the state appellate court found that Petitioner was not prejudiced by this failure because there was

6  no reasonable probability that the outcome of the case would have been different had counsel

7  objected. *Id.* at 14. First it noted that Adler had told the jury that she knew nothing about the

8  case, and the jury was instructed that it need not accept her testimony as true or correct and could

9  disregard any opinion that it found "unbelievable, unreasonable, or unsupported by the evidence."

10  *Id.* The state appellate court reasonably presumed that the jury followed its instructions. *Id.*; *see*

11  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)

12  (jury is presumed to follow its instructions); *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011)

13  (habeas court must presume that jury follows instructions it was given). Secondly, the state

14  appellate court found that the state of the evidence strongly supported the conclusion that the

15  sexual encounter was not consensual: M. gave a highly detailed description of the incident to

16  Officer Moggia describing the incident, which included the details that Petitioner grabbed her by

17  the hair, held a knife to her cheek, picked her up and put her in the back of the car, and had

18  intercourse with her as she was pushing, kicking and yelling "no"; and Petitioner's admissions to

19  the police that he had scared M., that he used a knife to scratch her, that he was angry, and that he

20  should not have had intercourse with her. *See supra* at 15. Furthermore, Petitioner's statements to

21  the police undermined his position at trial that he reasonably believed that M. consented to go with

22  him and have intercourse with him. *Id.* Had counsel objected to Adler's testimony or portions

23  thereof, the result of the proceedings would not have been different because the strong evidence

24  against Petitioner would not have changed. *Strickland*, 466 U.S. at 694. Accordingly, the state

25  court's rejection of this claim was not contrary to, or an unreasonable application of, clearly

26  established Supreme Court precedent, nor was it based on an unreasonable determination of the

27  facts in light of the evidence presented. 28 U.S.C. § 2254(d). Petitioner is not entitled to federal

28  habeas relief on this claim.

United States District Court
Northern District of California

1

**b.**     <u>Failure to Cross-Examine Adler and Call Defense Expert (Claim 2)</u>

2     Petitioner's second claim is that trial counsel was ineffective for failing to cross-examine

3 Adler and to secure an independent expert witness. Petitioner generally asserts that counsel's

4 deficient performance was prejudicial. (Pet. Attach. at 6-3, 6-4.) Respondent asserts that counsel

5 was not ineffective for declining to cross-examine Adler because it was a reasonable trial strategy.

6 (Ans. at 14.) Because the expert testimony was relevant and properly admitted, Respondent

7 asserts that "counsel was under no obligation to leave the witness up on the witness stand by

8 asking questions that would negate the fact that by her own testimony [M.] did not report the

9 attack, [M.] decided to submit to the rape as it was happening, and [M.] blamed herself for her stab

10 wounds." (*Id.*)

11     Even if this Court assumes counsel was deficient for failing to cross-examine Adler,

12 Petitioner cannot show prejudice because, as discussed above, the evidence against him was

13 strong. *See supra* at 17. Petitioner presents not even a speculative argument as to how a cross-

14 examination of Adler would have yielded a different result. Adler stated that she had no

15 knowledge of the particular case, and the jury was advised that it could give as little or as much

16 weight to her testimony as was appropriate based on the evidence. *Id.* at 16. Adler's generic

17 testimony on her areas of expertise was presented by the prosecution to explain M.'s recantation

18 and inconsistent behavior after the incident; she rendered no expert opinion on the case or the

19 relationship between M. and Petitioner, e.g., that M.'s behavior was indicative of rape trauma

20 syndrome or intimate partner battering. Indeed, such an opinion would not have been permissible

21 because rape trauma syndrome is inadmissible to prove that rape did, in fact, occur. *Id.* at 13. As

22 such, it is difficult to conceive what questions counsel could have asked in cross-examination to

23 undercut the weight of Adler's generic testimony, and Petitioner presents none.

24     Petitioner also fails to show prejudice with regard to trial counsel's failure to retain an

25 "independent expert witness" on "BWS [battered woman syndrome]" and "RTS [rape trauma

26 syndrome]." (Pet. Attach. at 6-3.) As Respondent points out, Petitioner offers no declaration from

27 a defense expert stating how he would have rebutted Adler's testimony. (Ans. at 15.) The state

28 appellate court found that Adler's testimony regarding rape trauma syndrome was properly

United States District Court
Northern District of California

1   admitted "to disabuse the jury of any misconceptions they may have had about the behavior of

2   rape victims, leaving them free to evaluate M.'s testimony and behavior in light of that

3   knowledge." *See supra* at 13; (Op. at 14-15). It was not admissible for the purpose of proving

4   that the rape did, in fact, occur. *Id.* The state appellate court also found that Adler's testimony

5   provided "more than sufficient" information regarding rape trauma syndrome to explain possibly

6   why M. behaved as she did after the incident. *Id.* at 14. Petitioner offers no explanation as to

7   what other information another expert witness on rape trauma syndrome could have possibly

8   provided. Accordingly, the Court is not persuaded that but for counsel's failure to call an

9   independent expert witness, the result of the proceeding would have been different. *Strickland*,

10  466 U.S. at 694. Accordingly, the state court's rejection of this claim was not contrary to, or an

11  unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

12  unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

13  Petitioner is not entitled to federal habeas relief on this claim.

14              c.       **Failure to Challenge Sentencing Enhancement (Claim 5)**

15          Petitioner's next ineffective assistance of counsel claim alleges that counsel failed to

16  challenge his one-strike enhancement for kidnapping and personal use of a deadly weapon because

17  the trial court improperly imposed the enhancement under California law. (Pet. Attach. at 6-6.)

18  Petitioner asserts that had counsel challenged the enhancement, he would not have been subject to

19  it. (*Id.*) Respondent argues that the underlying state law issue does not raise a federal question

20  cognizable on federal habeas review, and that the Court must defer to the state court's resolution

21  of this matter against Petitioner. (Ans. at 18.)

22          Respondent is correct that a person in custody pursuant to the judgment of a state court can

23  obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the

24  Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). In other words, "it is

25  only noncompliance with federal law that renders a State's criminal judgment susceptible to

26  collateral attack in the federal courts." *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010). The Supreme

27  Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for

28  alleged error in the interpretation or application of state law. *See Swarthout v. Cooke*, 131 S. Ct.

859, 861-62 (2011); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Peltier v. Wright*, 15 F.3d 860, 861-62 (9th Cir. 1994).

While Respondent's attack on the underlying claim is sound, this ineffective assistance of counsel claim may be dismissed on the merits because Petitioner cannot show prejudice.  As Respondent points out, the state appellate court found no sentencing error with respect to the imposition of the one-strike enhancement by the trial court.  (Ans. at 18.)  Although Petitioner makes a general assertion of prejudice in his petition, there is nothing in the record to support it, and he has failed to file a traverse to provide further argument.  Accordingly, Petitioner has failed to show that there is a reasonable probability that the result of the proceeding would have been different but for counsel's deficient performance, *i.e.*, had counsel challenged the enhancement, Petitioner would not have been subject to the enhancement.  *Strickland*, 466 U.S. at 688, 694.  The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

### d.  Failure to Challenge Sentence under the Eighth Amendment (Claim 7)

Petitioner's last ineffective assistance of counsel claim is that counsel was deficient for failing to challenge his sentence as cruel and unusual punishment in violation of the Eighth Amendment because it was substantially harsher than similarly situated defendants.  (Pet. at 6-8.)  Respondent asserts this claim is without merit because Petitioner's sentence was not constitutionally disproportionate and therefore, counsel was not ineffective for failing to raise this meritless claim.  (Ans. at 19.)

The Eighth Amendment contains a "narrow" proportionality principle.  *Graham v. Florida*, 560 U.S. 48, 59-60 (2010).  This principle "'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are grossly disproportionate to the crime.'"  *Id.*; *see Solem v. Helm*, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates 8th Amendment).  "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences

United States District Court
Northern District of California

United States District Court
Northern District of California

1    will be exceedingly rare." *Solem*, 463 U.S. at 289-90; *see also Crosby v. Schwartz*, 678 F.3d 784,

2    795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and

3    extreme, and constitutional violations on that ground are 'only for the extraordinary case.'")

4    (citing *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003)). In analyzing a disproportionality challenge

5    to a specific sentence, the court "considers all of the circumstances of the case to determine

6    whether the sentence is unconstitutionally excessive." *Graham*, 560 U.S. at 59. Only extreme

7    sentences that are grossly disproportionate to the crime violate the Eighth Amendment. *United*

8    *States v. Carr*, 56 F.3d 38, 39 (9th Cir. 1995).

9         For the purposes of review under 28 U.S.C. § 2254(d)(1), it is clearly established that "[a]

10   gross proportionality principle is applicable to sentences for terms of years." *Andrade*, 538 U.S. at

11   72; *Gonzalez v. Duncan*, 551 F.3d 875, 882 (9th Cir. 2008). Prior to *Graham*, but after *Andrade*

12   and *Ewing v. California*, 538 U.S. 11 (2003), the "only relevant clearly established law amenable

13   to the 'contrary to' or 'unreasonable application of' [AEDPA] framework is the gross

14   disproportionality principle, the precise contours of which are unclear and which is applicable only

15   in the "exceedingly rare' and 'extreme' case." *Norris v. Morgan*, 622 F.3d 1276, 1286 (9th Cir.

16   2010) (quoting *Andrade*, 538 U.S. at 72); *see Gonzalez*, 551 F.3d at 882 ("The Supreme Court's

17   Eighth Amendment jurisprudence establishes that no penalty is per se constitutional, and that

18   successful challenges to the proportionality of particular sentences are exceedingly rare and

19   reserved only for the extraordinary case.") (internal quotation, brackets, and citation omitted).

20   Thus, at a minimum, prior to *Graham*, but after *Andrade* and *Ewing*, "it was clearly established...

21   that in applying gross disproportionality principle courts must objectively measure the severity of

22   a defendant's sentence in light of the crimes he committed." *Norris*, 622 F.3d at 1287.

23        The Court is not persuaded that Petitioner's case is such an "extraordinary" one to warrant

24   relief based on the alleged disproportionality of his sentence. *See Gonzalez*, 551 F.3d at 882;

25   *Norris*, 662 F.3d at 1286. Petitioner was convicted of forcible rape, kidnapping, assault with a

26   deadly weapon, and criminal threats for which he was sentenced to 25 years to life. *See supra* at

27   1. Twenty-five years was the mandated sentence for felony sex offenses under California Penal

28   Code § 667.61(a), where two or more specified circumstances are found under subdivision (e).

1   Generally, as long as the sentence does not exceed the statutory maximum, which it does not in

2   this case, it will not be overturned on Eighth Amendment grounds. *See Belgarde v. Montana*, 123

3   F.3d 1210, 1215 (9th Cir. 1997); *see also United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir.

4   1998) ("'[a] sentence which is within the limits set by a valid statute may not be overturned on

5   appeal as cruel and unusual.'") (citation omitted); *see, e.g., United States v. Albino*, 432 F.3d 937,

6   938 (9th Cir. 2005) (applying rule to uphold statutory minimum 10-year sentence for federal

7   conviction for growing 2,349 marijuana plants).  Furthermore, as Respondent asserts, Petitioner's

8   crimes involved multiple acts of violence against a single, vulnerable victim. (Ans. at 19.)  It

9   cannot be said that Petitioner's sentence was so extreme in light of the severity of his crimes to be

10  grossly disproportionate, especially in comparison to *Harmelin*, in which the U.S. Supreme Court

11  found that a mandatory sentence of life without possibility of parole for a first offense of

12  possession of 672 grams of cocaine -- a non-violent offense compared to Petitioner's serious

13  crimes -- did not raise an inference of gross disproportionality. *See Harmelin*, 501 U.S. at 1005.

14  Because such an Eighth Amendment challenge to Petitioner' sentence would have been meritless,

15  it cannot be said that trial counsel's failure to raise it was objectively unreasonable. *See*

16  *Strickland*, 466 U.S. at 687-88.  Furthermore, Petitioner has failed to show that he was prejudiced

17  by counsel's failure to make such a challenge because he has not shown that the result of the

18  proceeding would have been different, *i.e.*, he would have received a lighter sentence, but for

19  counsel's failure. *See id.* at 694.  Accordingly, the state court's rejection of this claim was not

20  contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor

21  was it based on an unreasonable determination of the facts in light of the evidence presented. 28

22  U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

23           2.      **Ineffective Assistance of Appellate Counsel (Claims 3, 6, 8, & 9)**

24                   a.      **Failure to Raise Trial Counsel Errors (Claims 3, 6, & 8)**

25           Petitioner claims that appellate counsel rendered ineffective assistance for failing to raise

26  ineffective assistance of trial counsel claims, i.e., Claims 2, 5, and 7, *see supra* at 11, 19 and 20,

27  on appeal.

28           Claims of ineffective assistance of appellate counsel are reviewed according to the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S.

2    259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882

3    F.2d 1428, 1433 (9th Cir. 1989). First, the petitioner must show that counsel's performance was

4    objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that

5    counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S.

6    at 285; *Moormann*, 628 F.3d at 1106. Petitioner must overcome the "strong presumption that

7    [appellate] counsel's conduct [fell] within the wide range of reasonable professional assistance,"

8    *Strickland*, 466 U.S. at 689. Second, the petitioner must show prejudice, which in this context

9    means that the petitioner must demonstrate a reasonable probability that, but for appellate

10   counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528

11   U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

12       To determine whether appellate counsel's failure to raise a claim of ineffective assistance

13   of trial counsel was objectively unreasonable and prejudicial, the district court must first assess the

14   merits of the underlying claim that trial counsel provided constitutionally deficient performance.

15   *Moormann*, 628 F.3d at 1106-07. If trial counsel's performance was not objectively unreasonable

16   or did not prejudice the petitioner under the standard set out in *Strickland*, then appellate counsel

17   did not act unreasonably in failing to raise a meritless claim of ineffective assistance of counsel,

18   and the petitioner was not prejudiced by appellate counsel's omission. *Moormann*, 628 F.3d at

19   1106-07.

20       As discussed above, the Court found no merit to any of Petitioner's underlying ineffective

21   assistance of trial counsel claims. With respect to Claim 3, the Court found that Petitioner failed

22   to show he was prejudiced by trial counsel's failure to cross-examine the expert witness or obtain

23   an independent defense expert under Claim 2, *see supra* at 18-19. With respect to Claim 6, the

24   Court found the claim was without merit because Petitioner failed to show that he was prejudiced

25   by trial counsel's failure to challenge the one strike enhancement under Claim 5. *Id.* at 19-20.

26   With respect to Claim 8, the Court found that trial counsel's failure to raise an Eighth Amendment

27   challenge to Petitioner's sentence was neither objectively unreasonable nor prejudicial under

28   Claim 7, *id.* at 22. Accordingly, appellate counsel did not act unreasonably in failing to raise these

1    meritless claims of ineffective assistance of trial counsel, and Petitioner was not prejudiced by

2    appellate counsel's omissions. *See Moormann*, 628 F.3d at 1106-07.

### b.    Failure to Challenge Kidnapping Charge (Claim 9)

4         Petitioner claims appellate counsel was ineffective for failing to argue that there was

5    insufficient evidence to support a guilty finding on the kidnapping count. (Pet. Attach. at 6-10.)

6    Specifically, Petitioner claims that the evidence was insufficient "to demonstrate the 'essential

7    element of asportation' of simple kidnapping" because the victim was not forced to travel "a

8    substantial distance under threat of imminent injury by a deadly weapon." (*Id.*)  In order to

9    establish that appellate counsel rendered ineffective assistance, Petitioner must show that the

10   underlying claim of insufficient evidence has merit.

11        The Due Process Clause "protects the accused against conviction except upon proof

12   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

13   charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

14   evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a

15   rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim,

16   *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas

17   relief, *see id.* at 324.

18        The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas

19   proceedings...." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (per curiam)

20   (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply

21   the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that

22   the evidence was insufficient to support petitioner's conviction).  A federal court reviewing

23   collaterally a state court conviction does not determine whether it is satisfied that the evidence

24   established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992),

25   cert. denied, 510 U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only question under

26   Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold

27   of bare rationality").  The federal court "determines only whether, 'after viewing the evidence in

28   the light most favorable to the prosecution, any rational trier of fact could have found the essential

United States District Court
Northern District of California

elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985), cert. denied, 475 U.S. 1048, and cert. denied, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), cert. denied, 469 U.S. 838 (1984). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts." *Coleman*, 132 S. Ct. at 2064.

After viewing the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found the essential element of asportation for kidnapping beyond a reasonable doubt. *Payne*, 982 F.2d at 338. Kidnapping under California Penal Code § 207, subdivision (a), requires the prosecution to prove: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. (Ans. at 21, citing *People v. Bell*, 179 Cal.App.4th 428, 435 (2009).) The jury instructions, CALCRIM 1215, included further explication regarding the third element of asportation: "Substantial distance means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider the other factors such as whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection." (CT 417.) The record provides the following relevant evidence for the charge of kidnapping: (1) M. stated during her preliminary hearing testimony that Petitioner grabbed her by the hair and told her that they should go home, and that she was scared, *see supra* at 2-3; (2) because Petitioner wanted to talk, she drove to somewhere off the freeway rather than home because there were people at her house, *id.*; (3) M. admitted that she told Officer Moggia that Petitioner had grabbed her hair, held a knife to her cheek, and scratched her twice with the knife on the shoulder, *id.* at 3; (4) Petitioner stated to the police that he made M. drive away from the

25

United States District Court
Northern District of California

1    parking lot at McDonalds because he wanted to be alone with her and did not want the police to

2    arrive, *id.* at 7; (5) Petitioner stated to the police that he used a knife to scare M., scratched her

3    with it, and had the knife in his hand all the time, *id.* at 8, ; (6) M. stated in her recorded police

4    interview that Petitioner had told her to drive while he held a knife to her throat, and she ended up

5    driving toward Morgan Hill, *id.* at 8.  Based on these statements, the jury could draw the

6    reasonable inference that M. drove herself and Petitioner away from the parking lot because she

7    feared Petitioner would harm her with the knife, and that she had not consented to go with him.

8    The jury could also reasonably infer that Petitioner moved M. a "substantial distance," not only

9    because the driving distance was clearly more than "slight or trivial," but because it increased the

10    risk of harm to M., gave Petitioner a greater opportunity to commit additional crimes, and

11    decreased the likelihood of detection.  Based on these reasonable inferences "from basic facts to

12    ultimate facts," a jury could find Petitioner guilty of kidnapping M. beyond a reasonable doubt;

13    accordingly, it cannot be said that Petitioner has overcome the highly deferential standard of

14    *Jackson* to establish a due process violation.  *See Jackson*, 443 U.S. at 324; *Coleman*, 132 S. Ct. at

15    2064.  Because the underlying claim has no merit, it cannot be said that appellate counsel's failure

16    to raise such a meritless claim on appeal was objectively unreasonable.  *See Smith*, 528 U.S. at

17    285.  Nor has Petitioner established prejudice because it is not at all probable that he would have

18    prevailed on such a meritless claim had appellate counsel raised it on appeal.  *Id.* at 285-86.

19         Based on the foregoing, the state court's rejection of Petitioner's ineffective assistance of

20    appellate counsel claims was not contrary to, or an unreasonable application of, clearly established

21    Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light

22    of the evidence presented.  28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief

23    based on these claims.

24         **3.    Due Process (Claim 4)**

25         Lastly, Petitioner claims that his right to due process was violated because he was not

26    present "at critical sentencing [] hearing" on January 9, 2014, and thereby deprived of an

27    opportunity to address other sentencing errors in the court.  (Pet. Attach. at 6-5.)  According to

28    Petitioner, the sentencing court "made a judgment on January 9, 2014" consistent with the Court

United States District Court
Northern District of California

1    of Appeal's ruling that the imposition of multiple sentences was erroneous. (*Id.*)

2        According to Respondent, on January 9, 2014, the trial court modified Petitioner's

3    sentence in accordance with the California Court of Appeal's order finding that the concurrent

4    term imposed for the felony assault count should be stayed pursuant to California Penal Code §

5    654. (Ans. at 21-22, citing to Op. at 23.) Respondent asserts that no substantial rights were

6    implicated, there was no increase in Petitioner's sentence, and his presence would not have made

7    any difference in the outcome of the proceeding. (*Id.*)

8        The Supreme Court has recognized that "the right to personal presence at all critical stages

9    of the trial . . . [is a] fundamental right[] of each criminal defendant." *Rushen v. Spain*, 464 U.S.

10   114, 117 (1983). This right derives from the Confrontation Clause of the Sixth Amendment and

11   the Due Process Clauses of the Fifth and Fourteenth Amendments. *Campbell v. Wood*, 18 F.3d

12   662, 671 (9th Cir. 1994) (en banc). The Confrontation Clause protects a defendant's right to face

13   his accusers and applies to every stage of a trial. *See Illinois v. Allen*, 397 U.S. 337, 338 (1970).

14   Due process, on the other hand, protects a defendant's right to be present "at any stage of the

15   criminal proceeding that is critical to its outcome if his presence would contribute to the fairness

16   of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see, e.g., United States v.*

17   *Mitchell*, 502 F.3d 931, 973 (9th Cir. 2007) (en banc) (no violation of rights under Due Process

18   Clause or Confrontation Clause where trial judge met ex parte with Marshal to discuss security

19   concerns regarding the transfer of the case to another venue and after defendant announced his

20   refusal to be present for the penalty phase of trial). A defendant has a "right to be present at all

21   stages of the trial where his absence might frustrate the fairness of the proceedings," *United States*

22   *v. Reyes*, 764 F.3d 1184, 1194 (9th Cir. 2014) (quotation marks omitted), but he is not required to

23   be present when his "presence would be useless, or the benefit but a shadow." *Id.* at 1193

24   (quotation marks omitted); *see id.* at 1193, 1194 (concluding no constitutional violation when

25   defendant was excluded from side bar conference between court, counsel, and prospective juror

26   because defendant's absence did not frustrate the fairness of the proceedings).

27       Petitioner was sentenced on December 14, 2010. (CT 505.) Accordingly, the hearing that

28   took place on January 9, 2014, was well after criminal trial proceedings had concluded, and

United States District Court
Northern District of California

1  Petitioner had no right to be present at this hearing under the Confrontation Clause. *See Allen*, 397

2  U.S. at 338. With respect to his right to be present under due process, the Court is not persuaded

3  that his absence from the January 9, 2014 hearing "frustrate[d] the fairness of the proceedings."

4  *Reyes*, 764 F.3d at1194. As Respondent asserts, on that date, Petitioner's sentence was modified

5  "to reflect the stay of a concurrent term imposed for his assault…." (Ans. at 22.) The state

6  appellate court opinion on direct review stated that "the case is remanded for the limited purpose

7  of resentencing appellant." (Op. at 23.) That being the sole matter before the sentencing court on

8  remand, there is nothing to support Petitioner's assertion that he would have had an opportunity to

9  address other sentencing errors had he been present. (Pet. Attach. at 6-5.) As such, the Court

10 finds that rather, the benefit of Petitioner's presence at the January 9, 2014 hearing – which had a

11 limited purpose --- would have been "but a shadow." *Reyes*, 764 F.3d at 1193. Accordingly, the

12 state courts' rejection of this claim was not an unreasonable application of Supreme Court

13 precedent or based on an unreasonable determination of the facts in light of the evidence

14 presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this

15 claim.

16

17                                   **IV. CONCLUSION**

18        After a careful review of the record and pertinent law, the Court concludes that the Petition

19 for a Writ of Habeas Corpus must be **DENIED**.

20        Further, a Certificate of Appealability is **DENIED**. See Rule 11(a) of the Rules Governing

21 Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a

22 constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable

23 jurists would find the district court's assessment of the constitutional claims debatable or wrong."

24 *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate

25 of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22

26 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254

27 Cases.

28

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated: June 7, 2016

BETH LABSON FREEMAN
United States District Judge

P:\PRO-SE\BLF\HC.14\05118Laurel_denyHC

29